**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1530**

CHELSEA C. ELINE; MEGAN A. BRYANT; ROSE R. MACGREGOR; CHRISTINE E. COLEMAN; ANGELA A. URBAN,

        Plaintiffs - Appellants,

      v.

TOWN OF OCEAN CITY, MARYLAND,

        Defendant - Appellee,

and

RICHARD W. MEEHAN; JOSEPH J. THEOBALD; ROSS C. BUZZURO,

        Defendants.

Appeal from the United States District Court for the District of Maryland, at Baltimore. James K. Bredar, Chief District Judge. (1:18-cv-00145-JKB)

Argued: May 5, 2021                         Decided: August 4, 2021

Before GREGORY, Chief Judge, KEENAN, and QUATTLEBAUM, Circuit Judges.

Affirmed by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Keenan joined. Chief Judge Gregory wrote a separate opinion concurring in the judgment.

Devon M. Jacob, JACOB LITIGATION, INC., Mechanicsburg, Pennsylvania, for Appellants. Bruce Frederick Bright, AYRES, JENKINS, GORDY & ALMAND, P.A., Ocean City, Maryland, for Appellee.

———————

QUATTLEBAUM, Circuit Judge:

In response to inquiries about topless sunbathing on its beaches, the Town of Ocean City, Maryland, passed an ordinance prohibiting public nudity. While the ordinance restricts both men and women from showing certain body parts in public, it prohibits only women from publicly showing their bare breasts. Plaintiffs, five women who seek "to be bare-chested in public in the same locations where it is lawful for men to be bare-chested," sued Ocean City to enjoin the ordinance, claiming it unconstitutionally discriminated against women. *See* J.A. 91a–95a. The gist of Plaintiffs' argument was that the gender classification in the ordinance could not withstand the heightened scrutiny required by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

The district court disagreed and granted Ocean City's Motion for Summary Judgment. We agree with the district court that Ocean City has established that prohibiting females from publicly showing their bare breasts is substantially related to an important government interest—protecting public sensibilities—and satisfies the heightened scrutiny of the Equal Protection Clause. For those reasons, and as explained below, we affirm.

I.

Ocean City is a beach town "located on a barrier island 8.4 miles long in Worcester County, Maryland and was originally founded as a fishing village in 1875." J.A. 358a. Ocean City currently has over 7,000 residents, with a median age around 54 years old. Despite its small population, Ocean City is a frequent tourist location, with over 300,000 vacationers per weekend during the busy summer months and 200,000 vacationers per

weekend during the off-season months. "Ocean City has long been identified and considered by its visitors and residents, and has identified itself, as a family-friendly resort catering to visitors of all ages and providing a family-friendly environment." J.A. 609a.

On August 17, 2016, Plaintiff Chelsea Eline contacted the Ocean City Police Department and the Worcester County State's Attorney "regarding her stated intention to go 'topless' in Ocean City[,] including on its beaches." J.A. 607a. "Eline took the position . . . that she had a constitutionally-protected right to be topless (i.e., expose her breasts) in public, including in Ocean City and on its beaches." J.A. 608a. As a result of her inquiry, the possibility of Ocean City becoming a topless beach "became a matter of great public attention and concern . . . ." J.A. 608a. Mayor Richard W. Meehan and members of the Ocean City Council "received many emails and phone calls from Ocean City residents and vacationers expressing great concern about the possibility that Ocean City beaches would become topless beaches." J.A. 608a (internal quotation marks omitted). Due to the large number of inquiries government officials received on the issue, Ocean City posted an announcement on its website titled "Ocean City Is Not a Topless Beach & Will Not Become A Topless Beach." J.A. 612a.

The Ocean City Council then held a special meeting to consider the first reading of a proposed ordinance to regulate public nudity—Ordinance 2017-10 ("the Ordinance"). The Ordinance defines nudity as follows:

> (a)　　Nude, or a State of Nudity means the showing of the human male or female genitals, pubic area, vulva, anus, or anal cleft with less than a full opaque covering, the showing of the female breast with less than a fully opaque covering of any part of the nipple, or the showing of the covered male genitals in a discernibly turgid state.

4

J.A. 46a. The Ordinance also recognizes that "[p]rotecting the public sensibilities is an important governmental interest" and contains a legislative finding that "a prohibition against females baring their breasts in public, although not offensive to everyone, is still seen by society as unpalatable." J.A. 45a.

At the meeting, the Ordinance was read, and the floor was opened to the public. Only one member in the audience—a 70-year-old Ocean City resident—spoke. She expressed support for the Ordinance. City Council then passed the Ordinance on first reading unanimously. Following that vote, a Council member moved to immediately enact the Ordinance on an emergency basis. That motion passed unanimously as well. After that, Mayor Meehan approved the passage of the Ordinance as an emergency ordinance.

Plaintiffs[1] sued Mayor Meehan and several other city officials[2] in the United States District Court for the District of Maryland, alleging a 42 U.S.C. § 1983 claim for violation of their equal protection rights.[3] Plaintiffs sought a declaration that the Ordinance violates

---

[1] None of the Plaintiffs are residents of Ocean City nor even the county in which it resides. Three are Maryland residents who live in other counties, and two reside out of state. All claim they frequent Ocean City beaches and state they desire to do so topless.

[2] The other officials were Emergency Services Director Joseph J. Theobald and Chief of Police Ross C. Buzzuro. Plaintiffs subsequently dismissed Meehan, Theobald and Buzzuro. Therefore, the case proceeded only against Ocean City.

[3] Plaintiffs also alleged a *Monell* claim against Ocean City for violation of Plaintiffs' equal protection rights. *See Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690 (1978) (holding that municipalities "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers"). Additionally, Plaintiffs alleged a claim for violation of Article 46 of the Declaration of Rights to the

the Equal Protection Clause and a preliminary and permanent injunction precluding Ocean City from enforcing the Ordinance.

Later, after Plaintiffs moved for a preliminary injunction, the parties presented evidence at a hearing on the motion. None of the Plaintiffs testified. Instead, they presented their proposed expert witness, Dr. Debby Herbenick, who had produced two expert reports. Dr. Herbenick's initial report acknowledges that the Ordinance contains language indicating that it was enacted for the protection of the public sensibilities. Despite that, she offered four opinions that conflict with the Ocean City Council's legislative findings:

    (1) the ordinance fails to acknowledge important similarities between female and male breasts,

    (2) the ordinance overstates differences between female and male breasts.

    (3) the notion that females baring their breasts in public "is still seen by society as unpalatable," is not supported by peer-reviewed scientific research.

    (4) peer-reviewed scientific research supports the conclusion that by not treating females and males equally in regard to their ability to appear barechested may contribute to harmful secondary effects, such as discouraging breastfeeding and promoting a culture that over-sexualizes girls and women; thus harming and not protecting the public.

J.A. 1260a. Dr. Herbenick's supplemental expert report indicated that she "systematically reviewed more than one thousand historical and contemporary photographs from Ocean City, Maryland." J.A. 1268a. Based upon this review, Dr. Herbenick opined "that public sensibilities have evolved rapidly over the decades regarding what males and females wear on or near the Ocean City beaches. From the 1930s to 1960s and 1970s, there were

---

Maryland Constitution. *See* Md. Const. Dec. of Rights, Art. 46 ("Equality of rights under the law shall not be abridged or denied because of sex.").

6

considerable changes that resulted in men going from covering their chests to baring their chests, and from women wearing dresses and even stockings to wearing bikinis." J.A. 1268a. Additionally, the supplemental expert report stated that "Ocean City has seen the establishment of two Hooters locations, with quite a few photos of 'Hooters girls' posing with young boys." J.A. 1268. Moreover, she indicated "recent decades have seen women in Ocean City wearing thong or g-string bikini bottoms, and even 'pasties' that cover just the nipples during 'Best Body' competitions." J.A. 1268a. At the hearing, Dr. Herbenick testified largely consistent with her reports.

Ocean City presented Mayor Richard Meehan, Council Member Mary P. Knight, and Melanie Pursel—the President and CEO of the Ocean City Chamber of Commerce. These witnesses all testified about communications they had received in support of the Ordinance.

The district court denied Plaintiffs' motion. Noting the majority of cases that have upheld similar public nudity laws, the court found that it was bound by our decision in *United States v. Biocic*, 928 F.2d 112, 115–116 (4th Cir. 1991), which recognized that protecting the portion of society that disfavored public display of female breasts furthers an important governmental interest.[4] The district court described the testimony from Ocean City's witnesses—Mayor Meehan, Council Member Knight and Ms. Pursel—which indicated that many Ocean City residents and vacationers had voiced strong opposition to

---

[4] Ocean City and the district court referred to this governmental interest as protection of "public sensibilities." *See* J.A. 45a, 432a–33a. For ease of reference, we adopt this shorthand description.

allowing public nudity in Ocean City. It then noted that "Plaintiffs did not testify, choosing instead to rely upon an expert witness, [Dr.] Herbenick . . . ." J.A. 431a. The district court did not find Dr. Herbenick's opinion persuasive and, more importantly, concluded that it was "not strictly relevant to the issue at hand" because "[i]nstead of her testifying as to what Ocean City's citizens' public sensibilities *are*, she testified as to what she thought they *should be*." J.A. 432a. Accordingly, the district court concluded that "Plaintiffs did not muster any evidence to show that Ocean City's citizens shared their view that women should be able to be bare-chested in public places as men are." J.A. 432a. It determined that "assessment of public sensibilities does not require precise scientific sampling," and found that Ocean City's witnesses were able to articulate the public sensibilities of the Ocean City community because—as elected officials—they are "accredited as accurate barometers of public sensibilities" and "can, and do, speak for the public." J.A. 432a. The court also relied on the information that Ocean City's witnesses provided about the support they received from the public about the ordinance. It concluded, therefore, that "Ocean City has shown its ordinance is substantially related to an important government objective, the protection of public sensibilities." J.A. 433a.

After a year of litigation, the parties each moved for summary judgment.[5] Through discovery, the record had been developed somewhat since the Order denying Plaintiffs'

---

[5] Additionally, Plaintiffs moved to exclude Mayor Meehan and Council Member Knight as expert witnesses, arguing that neither were qualified to offer expert opinions, that their opinions would not be reliable and that Ocean City did not comply with the disclosure requirements of Federal Rule of Civil Procedure 26(a)(2). In response, Ocean City clarified that it was not offering these witnesses as experts but, instead, was offering

Motion for Preliminary Injunction. For example, the parties deposed several witnesses and produced emails from concerned residents and vacationers, which were largely in support of the Ordinance. Nevertheless, the arguments offered at summary judgment were not materially different from those offered in connection with the Motion for Preliminary Injunction.

The district court granted summary judgment for Ocean City on all of Plaintiffs' claims. Initially, in evaluating Ocean City's adoption of the Ordinance, it "'assume[d], without deciding' that a classification based on 'anatomical differences between male and female' qualifies as a gender-based distinction in the context of the equal protection analysis." J.A. 1306a (quoting *Biocic*, 928 F.2d at 115). The district court then found that Dr. Herbenick's opinions were irrelevant and declined to consider them in evaluating Plaintiffs' constitutional challenges to the Ordinance. In its Order, the district court found that "Dr. Herbenick's opinion that the ordinance overstates differences between females and males in terms of breasts/chests, focusing heavily on sexualization does not help the Court to understand whether Ocean City's public sensibilities support a ban on public female toplessness." J.A. 1303a (internal quotation marks omitted). Nor, the district court concluded, did Dr. Herbenick's opinion that female toplessness is not generally seen as

---

them as fact witnesses who may offer lay opinions. The district court agreed that Ocean City was not seeking to offer expert testimony, concluding that Mayor Meehan and Council Member Knight were entitled to "testify as to what they have observed and experienced in the course of their personal community interactions," as such testimony was "relevant to determining the purpose of the Ordinance . . . ." J.A. 1300a–02a. Accordingly, the district court denied Plaintiffs' Motion to Exclude as moot.

unpalatable in contemporary American society help resolve whether female toplessness is considered unpalatable in Ocean City.

Then, relying on this Court's decision in *Biocic*, as well as most courts from around the country that have considered this issue, the district court held that the purpose of the restriction—protecting the public sensibilities—was an important governmental interest. Finally, echoing its analysis of the evidence presented by Ocean City in response to Plaintiffs' Motion for Preliminary Injunction, the court held that the record established that the restriction was substantially related to that interest.[6] Accordingly, the district court granted Ocean City's Motion for Summary Judgment and denied Plaintiffs' Motion for Summary Judgment.

Plaintiffs filed a timely Notice of Appeal from the district court's Order. They ask us to reverse the district court's grant of summary judgment in favor of Ocean City and find that the Ordinance is unconstitutional under the Equal Protection Clause of the United States Constitution. In assessing this argument, we review that decision de novo, "applying the same legal standards as the district court and viewing all facts and reasonable inferences in the light most favorable to the nonmoving party." *Ballengee v. CBS Broad., Inc.*, 968 F.3d 344, 349 (4th Cir. 2020).

---

[6] Because the district court found no constitutional violation, it also granted summary judgment for Ocean City on Plaintiffs' *Monell* claim. Additionally, the district court—applying Maryland law—found "substantial justification" for the Ordinance and granted summary judgment for Ocean City on Plaintiffs' claim under Article 46 of the Maryland Declaration of Rights. *See Giffin v. Crane*, 716 A.2d 1029, 1037 (Md. 1998) (noting that Article 46 "flatly prohibits genderbased classifications, absent substantial justification").

## II.

The Equal Protection Clause of the United States Constitution provides that: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. When a law containing a gender-based classification is challenged under the Equal Protection Clause, "[t]he burden of justification is demanding and it rests entirely on the State." *United States v. Virginia*, 518 U.S. 515, 533 (1996). When examining the "differential treatment[,] . . . the reviewing court must determine whether the proffered justification is exceedingly persuasive." *Id.* at 532–33 (internal quotation marks omitted).

"The defender of legislation that differentiates on the basis of gender must show 'at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017) (quoting *Virginia*, 518 U.S. at 533). Moreover, the classification must meet that heightened standard by today's assessment, for the Supreme Court "has recognized that new insights and societal understandings can reveal unjustified inequality within our most fundamental institutions that once passed unnoticed and unchallenged." *Obergefell v. Hodges*, 576 U.S. 644, 673 (2015). "The justification must [also] be genuine, not hypothesized or invented *post hoc* in response to litigation." *Virginia*, 518 U.S. at 533. "And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id.*

However, "[t]he heightened review standard [the Supreme Court's] precedent establishe[d] does not make sex a proscribed classification." *Id.* That is so because "the two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both." *Ballard v. United States*, 329 U.S. 187, 193 (1946). "Inherent differences between men and women, we have come to appreciate, remain cause for celebration, but not for denigration of the members of either sex or for artificial constraints on an individual's opportunity." *Virginia*, 518 U.S. at 533 (internal quotation marks omitted). Laws may, for that reason, acknowledge the physical differences between men and women so long as they are not "used, as they once were, to create or perpetuate the legal, social, and economic inferiority of women." *Id*. at 534 (internal citation omitted).

Whether laws that prohibit public nudity by referencing anatomical differences between women and men—as the Ordinance does—qualify as gender-based classifications that are subject to heightened scrutiny for purposes of the Equal Protection Clause has not been squarely addressed by this Court or the Supreme Court. However, we decline to delve into that issue because, even assuming that the classification in the Ordinance is subject to heightened scrutiny, the gender-based classification in the Ordinance "serves important governmental objectives and . . . the discriminatory means employed are substantially related to the achievement of those objectives." *Virginia*, 518 U.S. at 533 (internal quotation marks omitted).

First, our *Biocic* decision teaches that the classification in the Ordinance serves an important government objective. There, an adult female "removed the top of her two-piece bathing suit, fully exposing her breasts" while walking on the beach in a Natural Wildlife

12

Refuge. *Biocic*, 928 F.2d at 113. An officer of the federal Fish and Wildlife Service charged her with violating a federal regulation, which provided that "[a]ny act of indecency or disorderly conduct as defined by State or local laws is prohibited on any national wildlife refuge." *Id.* (alteration in original) (citing 50 C.F.R. § 27.83). The applicable local ordinance made it "unlawful for any person to knowingly, voluntarily, and intentionally appear . . . in a place open to the public or open to public view, in a state of nudity" and defined "state of nudity" to include the showing of female breasts. *Id.* (alteration in original). She appealed her conviction under this regulation, claiming that it violated the Equal Protection Clause. *Id.* at 114. We disagreed, concluding that:

> The important government interest is the widely recognized one of protecting the moral sensibilities of that substantial segment of society that still does not want to be exposed willy-nilly to public displays of various portions of their fellow citizens' anatomies that traditionally in this society have been regarded as erogenous zones. These still include (whether justifiably or not in the eyes of all) the female, but not the male, breast.

*Id.* at 115–16. *Biocic* is clear. And we are not permitted to discard it merely due to the passage of time.

Importantly, the overwhelming majority of courts that have addressed laws banning public female toplessness have upheld their constitutionality. *See, e.g.*, *Free the Nipple – Springfield Residents Promoting Equal. v. City of Springfield, Mo.*, 923 F.3d 508, 512 (8th Cir. 2019) (noting "important governmental interests in promoting public decency and proscribing public nudity to protect morals, public order, health, and safety" and collecting cases upholding similar laws); *see also* Kimberly J. Winbush, *Regulation of exposure of female, but not male, breasts*, 67 A.L.R.5th 431, § 2[a] (1999) ("As a general rule, the

13

courts have concluded that the equal protection clause of the Fourteenth Amendment does not prohibit such ordinances . . . .").[7]

Plaintiffs acknowledge *Biocic* and the other courts that have expressed the same view. They ask us to overrule *Biocic*, however, largely suggesting it represents a viewpoint that is outdated at best and misguided at worst. As far as being outdated, Plaintiffs argue that "[t]his nation has evolved significantly" during the thirty years since this Court issued its decision in *Biocic*. Appellants' Br. at 41. Therefore, in light of what they characterized as the changing public sentiment towards females as well as the Supreme Court's recent equal protection jurisprudence, Plaintiffs ask the Court to overrule *Biocic* and conclude that protecting the public sensibilities is no longer an important government interest.

To be sure, public attitudes about gender and sexuality are constantly changing and evolving. But our precedent has not changed. As a three-judge panel, we may not overrule *Biocic*, and it has not been overruled by the Supreme Court. In any event, Plaintiffs arguments do not persuade us that the important government interest we recognized then is no longer important.

---

[7] The outlier on this issue is *Free the Nipple-Fort Collins v. City of Fort Collins, Co.*, 916 F.3d 792 (10th Cir. 2019). There, the Tenth Circuit, in a divided decision, held a similar ordinance failed to withstand heightened scrutiny when justified on three reasons other than public sensibilities. *See id.* at 802–05. The issues presented to the Tenth Circuit, however, were in a different procedural context. The Tenth Circuit was reviewing a district court's issuance of a preliminary injunction; therefore, its finding on the constitutionality of the ordinance was limited to concluding that the plaintiffs "made a strong showing of their likelihood of success on the merits . . . ." *Id.* at 805. Even so, it acknowledged that its decision represented "the minority viewpoint." *Id.*

As far as being misguided, Plaintiffs point out that perceived public moral sensibilities have been used to justify government action that we now recognize to be unconstitutional if not outright immoral. On this issue, they have a point. The judicial legacy of justifying laws on the basis of the perceived moral sensibilities of the public is far from spotless. Some government action that we now rightly view as unconstitutional, if not immoral, has been justified on that basis. Even so, in this situation, protecting public sensibilities serves an important basis for government action. Thus, following *Biocic* and the majority of courts that have addressed the issue, we find no error in the district court's determination that the provision in the Ordinance prohibiting the public showing of female breasts furthers the important governmental interest of protecting the public sensibilities.[8]

Last, Plaintiffs alternatively argue that, even if *Biocic* controls, Ocean City has not established that the Ordinance is substantially related to protecting the public sensibilities of Ocean City residents and vacationers. That position, however, is belied by the record.

Ocean City presented testimonial and documentary evidence that demonstrated Ocean City residents and vacationers overwhelmingly supported the Ordinance. The vast majority of the emails in the record favor the Ordinance. And Meehan, Knight and Pursel all testified that they had received communications from residents and vacationers supporting it as well.

---

[8] Of course, the Ordinance could serve other important governmental interests, such as "promoting public decency and proscribing public nudity to protect morals, public order, health, and safety." *See City of Springfield, Mo.*, 923 F.3d at 512. But those are not before us, and *Biocic* controls on the important governmental interest advanced by Ocean City.

15

Undeterred, Plaintiffs offer several counter-arguments. First, they criticize Ocean City's evidence. They argue it is not illustrative of the views of Ocean City because its population is transient due to tourism. But the emails sent to Mayor Meehan undermine this argument. Alongside the view of residents, many of the emails came from tourists who indicated that they would not vacation in Ocean City if public female toplessness was allowed.

Additionally, Plaintiffs argue the testimony of Ocean City's leaders who expressed their opinions on the public sensibilities concerning female toplessness lacks sufficient scientific basis. For example, they suggest that Ocean City officials did not save all emails related to the Ordinance and point out that the "names of the people who complained by telephone or in person were not recorded . . . ." Appellants' Br. at 23. But nothing in our precedent requires that a municipality empirically prove the public sensibilities of a community. The district court rightly held that Ocean City's leaders could offer testimony as fact witnesses giving lay opinions about the moral sensibilities of the Ocean City community based on their personal community interactions, including those interactions as elected officials. That is sufficient to show that the Ordinance is substantially related to this important governmental interest.

Finally, Plaintiffs contend the district court erred by excluding Dr. Herbenick's expert reports and testimony. They claim that this evidence reveals that public female toplessness does not violate the public sensibilities of Ocean City residents and vacationers. Even so, much of their briefing focuses on explaining Dr. Herbenick's qualifications and the methodology that she used to reach her opinions. Those arguments, however, miss the

16

point. To be sure, Dr. Herbenick has experience and expertise in human sexuality, including American societal attitudes concerning female breasts. But that does not make her testimony or opinions relevant to the discrete issue in this case—the public sensibilities of Ocean City residents and vacationers on the issue of public female toplessness. As the district court properly noted, while Dr. Herbenick's supplemental expert report does show a substantial transformation in male and female swimwear in Ocean City over the last century, "[t]he issue facing the Court is not whether society's ideas around appropriate beachwear have evolved over time, as they undeniably have . . . ." J.A. 1304a. The issue is the current public sensibilities on the issue of public female toplessness, and Dr. Herbenick offered no evidence that the public sensibilities of Ocean City residents or vacationers have evolved on that discrete issue.

The Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "In reviewing a trial court's ruling on experts, we are mindful of the Supreme Court's admonition against 'applying an overly stringent review . . . [that] fail[s] to give the trial court the deference that is the hallmark of abuse-of-discretion review.'" *United States v. Ancient Coin Collectors Guild*, 899 F.3d 295, 318 (4th Cir. 2018) (alterations in original) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997)). Accordingly, and in light of our deferential standard of review, we cannot conclude that the district court erred in concluding that Dr.

17

Herbenick's testimony would not be helpful "to understand the evidence or to determine a fact in issue."[9] *See* Fed. R. Evid. 702(a).

In sum, Ocean City has met its burden of showing the Ordinance is substantially related to an important government interest. The burden of proving the Ordinance's constitutionality rests with Ocean City, and it offered the only admissible evidence on the public sensibilities of Ocean City residents and vacationers. Accordingly, we find that Ocean City has met its burden of providing an exceedingly persuasive justification for treating the public showing of bare breasts by females and males differently in the Ordinance. We further hold that the prohibition on public female toplessness is substantially related to the important governmental interest in protecting the public sensibilities of Ocean City. *See Virginia* at 518 U.S. at 533. Therefore, we affirm the district court's grant of Ocean City's Motion for Summary Judgment on Plaintiffs' equal protection claim.[10]

---

[9] Similarly, we conclude that the district court did not err in denying Plaintiff's Motion to Exclude the testimony of Mayor Meehan and Council Member Knight. These witnesses were offered as lay witnesses. They provided opinion testimony that was based on their perceptions dealing with Ocean City residents and vacationers, was helpful in determining Ocean City's purpose in adopting the Ordinance and was not based on scientific, technical or other specialized knowledge. This is a quintessential example of the type of opinion testimony from lay witnesses that is permitted by Federal Rule of Evidence 701, and the district court did not abuse its discretion in finding it admissible. *See United States v. Hassan*, 742 F.3d 104, 130, 135–36 (4th Cir. 2014) (outlining the requirements for lay opinion testimony and noting that we will only overturn an evidentiary ruling "that is arbitrary and irrational" (internal quotation marks omitted)).

[10] Because we find that the district court properly concluded there was no constitutional violation, we also affirm the district court's grant of summary judgment on

18

III.

For the reasons stated above, the district court's Order granting Ocean City's Motion for Summary Judgment, denying Plaintiffs' Motion for Summary Judgment and denying Plaintiffs' Motion to Exclude is

*AFFIRMED.*

---

Plaintiffs' *Monell* claim. And we find, for the reasons expressed by the district court, that the Ordinance does not violate Article 46 of the Maryland Constitution.

GREGORY, Chief Judge, concurring:

I agree that we must affirm the district court's grant of summary judgment to Ocean City under *United States v. Biocic*, 928 F.2d 112, 115–16 (4th Cir. 1991). However, I write separately, concerned that *Biocic*'s reasoning is inconsistent with equal protection principles. In *Biocic*, this Court upheld gender-based distinctions in nudity laws, believing them to substantially relate to an important governmental interest: "protecting the [community's] moral sensibilities." *Id.* at 115. Though we are bound by *Biocic*, the majority properly recognizes that "[s]ome government action that we now rightly view as unconstitutional, if not immoral," has been justified by invoking "the perceived moral sensibilities of the public." Maj. Op. at 15. This case raises the question, then, of how we distinguish between the types of disparate treatment justified by a community's public sensibilities and those that are not.

Ordinarily, we answer this question by determining whether the law's discriminatory classifications "create or perpetuate the legal, social, and economic inferiority of women." *United States v. Virginia*, 518 U.S. 515, 533 (1996). A law discriminating this way would not be permissible on the grounds that it reflected the views of a particular community. *See Lawrence v. Texas*, 539 U.S. 558, 582 (2003) (O'Connor, J., concurring) ("Indeed, we have never held that moral disapproval, without any other asserted state interest, is a sufficient rationale under the Equal Protection Clause to justify a law that discriminates among groups of persons.").

But *Biocic* contradicts this rule by permitting gender discrimination so long as the law doing so is supported by "public sensibilities." Because local legislative bodies

20

represent the communities that elected them, their legislative acts presumably reflect the public sensibilities of those communities. *See Reynolds v. Sims*, 377 U.S. 533, 562 (1964) ("As long as ours is a representative form of government, [] our legislatures are those instruments of government elected directly by and directly representative of the people."). Upholding discrimination because it reflects public sensibilities therefore defers to the legislative body that passed it, effectively applying a kind of rational-basis review contrary to the heightened scrutiny required under the Equal Protection Clause. *See Virginia*, 518 U.S. at 555.

Moreover, the Court's heightened scrutiny is incomplete if we assume without deciding that this ordinance enacts a form of gender-discrimination. *See Biocic*, 928 F.2d at 115. Heightened scrutiny serves the purpose of "smok[ing] out" any impropriety underlying a form of discrimination. *See Johnson v. California*, 543 U.S. 499, 506 (2005) (quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989)); Cary Franklin, *The Anti-Stereotyping Principle in Constitutional Sex Discrimination Law*, 85 N.Y.U. L. Rev. 83, 146 (2010). Because of that, each step in the intermediate scrutiny analysis is interconnected. *See* Franklin, *The Anti-Stereotyping Principle*, *supra*, at 138 n.296 ("The anti-stereotyping principle pervades both stages of [intermediate scrutiny], shaping what constitutes an important interest and what means qualify as sufficiently narrowly tailored to serve this interest."). Thus, we must grapple with the nature of the alleged discrimination to establish whether the government's ends justify its means. Rather than assuming that this ordinance presents a cognizable form of gender-based discrimination, this Court must ask whether it perpetuates the legal, social, or economic inferiority of women.

Many of the Supreme Court's gender-discrimination cases have involved laws erecting economic, educational, or employment barriers between men and women. *See, e.g.*, *Califano v. Westcott*, 443 U.S. 76, 84, 88–89 (1979) (holding unconstitutional provision that gave unemployed-parent benefits exclusively to fathers); *Califano v. Goldfarb*, 430 U.S. 199, 206–207 (1977) (plurality opinion) (holding unconstitutional a Social Security classification that denied widowers survivors' benefits available to widows); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648–653 (1975) (holding unconstitutional a Social Security classification that excluded fathers from receipt of child-in-care benefits available to mothers); *Frontiero v. Richardson*, 411 U.S. 677, 688–691 (1973) (plurality opinion) (holding unconstitutional exclusion of married female officers in the military from benefits automatically accorded married male officers); *Reed v. Reed*, 404 U.S. 71, 74, 76–77 (1971) (holding unconstitutional a probate-code preference for a father over a mother as administrator of a deceased child's estate); *Virginia*, 518 U.S. at 555–58 (holding unconstitutional the Virginia Military Institute's male-only admissions policy).

But the Court's gender-discrimination cases extend beyond economic or educational opportunities. In *Craig v. Boren*, the Supreme Court struck down a sex-based restriction on the purchase and sale of certain alcoholic beverages. 429 U.S. 190, 204 (1976). Though the law imposed a relatively insignificant burden, the Court nevertheless recognized it to fall within a run of statutes that impermissibly rested upon "'archaic and overbroad' generalizations" about gender. *Id.* at 198 (quoting *Schlesinger v. Ballard*, 419 U.S. 498, 508 (1975)).

Across all of these cases, the Court has consistently struck down gender-based restrictions, even ones supposedly based upon "reasonable considerations," because those laws were premised upon noxious gender stereotypes. *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 135 (1994). Laws premised upon noxious gender stereotypes stand as yet another plank propping up the structure of gender inequality. While many of those laws were enacted out of a paternalistic attempt to "protect" members of a certain gender, they proved unconstitutional because they relied upon stereotypical understandings of where men and women belong both in the public and at home. *See Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 725 & n.10 (1982); *Weinberger*, 420 U.S. at 648–653. And the Constitution requires us to remain wary of those paternalistic laws in search of victims to protect. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1692 (2017); Melissa Murray, *Inequality's Frontiers*, 122 Yale L. J. Online 235, 236–37, 239–40 (2013).

At first glance, Ocean City's ordinance seems innocuous enough. It forbids public nudity and defines nudity in a way commonly understood across western societies. But we must take care not to let our analysis be confined by the limits of our social lens. *See Obergefell v. Hodges*, 576 U.S. 644, 673 (2015). Suppose the ordinance defined nudity to include public exposure of a woman's hair, neck, shoulders, or ankles. Would that law not run afoul of the Equal Protection Clause?[1] While the ordinance here imposes a much narrower restriction on women, this is only a difference in degree, and not in kind.

---

[1] This is not to suggest that there is anything wrong, for example, with women choosing to cover their hair due to personal or religious beliefs about modesty. Where such a rule is imposed broadly by law, however, such a restriction takes on different meaning.

23

Viewed in this light, laws that discriminate between male and female toplessness embody problematic stereotypes through the control imposed upon the bodies of women and not men. *See Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 915 (1992) (Stevens, J., concurring in part, dissenting in part) ("'Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds.' . . . The same holds true for the power to control women's bodies."). By requiring women to cover up, such laws heighten the "feminine mystique" and all the baggage that it forces women to carry. *See generally* Betty Friedan, Feminine Mystique (1963); bell hooks, Feminist Theory: From Margin to Center (1984). By treating women's breasts (but not those of men) as forbidden in public sight, these laws may reduce women's bodies to objects of public gaze, reproduce the Victorian-era belief that women should be seen but not heard, and reinforce stereotypes that sexually objectify women rather than treating them as people in their own right.

In *Free the Nipple-Fort Collins v. City of Fort Collins, Co.*, the Tenth Circuit came to that very conclusion. 916 F.3d 792, 802–05 (10th Cir. 2019). It determined that laws prohibiting female toplessness perpetuate negative sex-object stereotypes about women and their bodies. *Id.* To be sure, the Tenth Circuit's case differs from our case procedurally, and it contains a different factual record as well. Even considering the evidence excluded by the district court, Plaintiffs present little evidence connecting female

24

toplessness to gender stereotypes.[2]  Nevertheless, this Court should reconsider *Biocic* and apply greater scrutiny to fulfill the full promise of equal protection.

---

[2]  For example, Plaintiffs offer journal articles that reference the sexual objectification of women, but these sources do not mention nudity laws at all, let alone explain how such laws are related.  Plaintiffs' expert, Dr. Herbenick, states in her report that disparate treatment of male and female breasts "may contribute to harmful secondary effects, such as . . . promoting a culture that oversexualizes girls and women."  J.A. 1260.  But she does not actually explain why or how.  The corresponding section of her report instead discusses whether the public thinks female toplessness should be banned.